WALTON T. BOYER *vs.* SHERMAN H. BOWLES & others.

Hampden.  September 18, 1941. — October 30, 1941.

Present: FIELD, C.J., QUA, DOLAN, COX, & RONAN, JJ.

*Partnership*, What constitutes, Partner's compensation, Rights and obligations of partners among themselves. *Words*, "To go 50–50."

Findings by a master in a suit in equity of the circumstances in which the plaintiff and the defendant, under a business name which did not include the true surname of either of them, entered upon an undertaking for the manufacture and sale of neon signs, the defendant to furnish all the necessary financial backing and the plaintiff to receive a certain amount per week as a "drawing account," and they "to go 50–50"; and of the method of conducting the business, warranted a conclusion that the parties were partners, and not employees of a corporation of which the defendant was an officer, although all the bookkeeping and financial transactions of the sign business were carried on through the gratuitous instrumentality of the corporation, the plaintiff had stated that he did not know exactly the status of the sign business, and no business name certificate had been filed in its behalf.

Facts found by a master as to conduct of the plaintiff and the defendant
as partners in a business of manufacturing and selling neon signs
under an agreement that the defendant should furnish all the neces-
sary financial backing, that the plaintiff should have a "drawing
account," and that the two should "go 50–50" did not warrant an
inference that sums drawn by the plaintiff were as compensation "for
devoting his time and energy to the partnership business," but re-
quired a conclusion that they were drawings against possible profits.

BILL IN EQUITY, filed in the Superior Court on July 31,
1935, and afterwards amended.

From a final decree entered by order of *Broadhurst,* J., in
accordance with findings, rulings, and an order for a final
decree by *Williams,* J., the plaintiff and the defendants
Bowles and The Republican Publishing Company appealed.

As to the relation of the defendant Bowles with the de-
fendant The Republican Publishing Company, a master to
whom the suit was referred found that Bowles "was . . .
an official" of that corporation "in some capacity which he
was unable to explain, except to state that he was author-
ized to bind" it, and that it "could handle the bookkeeping
requirements of the neon sign business."

The case was submitted on briefs.

*J. H. Mulcare & N. L. Snow,* for the plaintiff.

*A. T. Garvey,* for the defendants Bowles and another.

Cox, J.  This is a bill in equity in which the plaintiff
originally asked for an accounting with the defendant
Bowles, alleged to be his partner, and that the defend-
ant The Republican Publishing Company, hereinafter re-
ferred to as the Company, and the defendant Hartfield
Realty Company be ordered to release certain attachments
alleged to have been made.  Allegations of an amendment
to the bill are to the effect that Bowles owed the partner-
ship for goods sold and delivered to the Company at his
request;  that the Company had advanced money to the
partnership;  and that Bowles had caused the Company to
bring the action in which the attachment was made for the
purpose of "putting the partnership out of business."  The
suit was referred to a master, whose report was confirmed
by interlocutory decree, and a final decree was entered
from which the plaintiff, Bowles and the Company appealed.

The bill was dismissed as to the "Hartford" (sic) Realty Company. No question is raised as to the propriety of this dismissal.

Three questions only are presented by the parties for decision: 1. Was there a partnership? 2. Were the sums received by the plaintiff as a "drawing account" received as a partial distribution of profits or as compensation? 3. Can the Company, on the pleadings, be found indebted to the partnership?

1. The master found that in 1928 the plaintiff and Bowles entered into an oral agreement in California whereby they became partners for the purpose of manufacturing and selling neon signs in Springfield, in this Commonwealth, "such finding being based upon other findings hereinafter contained." Accordingly, it is for us to draw our own inferences and conclusions from the subsidiary facts found as to whether a partnership existed. Busteed v. Cambridge Savings Bank, 306 Mass. 9, 13. In substance, the "other findings" are that Bowles purchased, in California, certain equipment that was shipped to Springfield "as part of the partnership agreement." He agreed to furnish all the necessary financial backing, and the plaintiff was to receive $60 per week, "which was termed to be a 'drawing account.' Boyer [the plaintiff] and Bowles agreed 'to go 50–50.'" Bowles furnished the plaintiff sufficient cash to enable him to come to Springfield, where he arrived early in July. In September or October, 1928, shortly after the business began to function, the plaintiff and Bowles selected the name of New England Neon Sign Company, under which the business was conducted. As the business progressed, Bowles acted as salesman on several occasions, on each of which the parties would discuss the prospective customers and prices, and "their business dealings with reference to such sales were the same as would be normally found between partners." In 1929, when some question arose over patents, the plaintiff and Bowles signed an agreement for the sign company. This agreement did not refer to them as partners, nor did it state that the sign company was a corporation, partnership or other entity, but "they

[the plaintiff and Bowles] acted in reference to this agreement as would be normally expected of partners." In 1935, a checking account in the name of the sign company was opened, and a letter, headed "Authorization Letter for a Partnership," signed by the plaintiff and Bowles as partners and stating that the sign company was a partnership, was filed with the bank. Two letters signed by Bowles, one in 1934 and one in 1937, showed that at those times he considered himself to be a partner of the plaintiff. When the business was commenced, Bowles told the plaintiff that its bookkeeping needs could be handled by the Company and suggested that the Company should make out bills, receive payments and pay bills; that such a system would work automatically, regardless of whether Bowles or the plaintiff was about and would allow the plaintiff to be free to give his entire time and attention to the manufacturing of signs. The Company set up the sign business on its books as a department of its own. It received moneys paid to the sign company, and paid the latter's bills and payroll. It never made any charge for this service. This "method of bookkeeping was adopted purely for purposes of convenience at the suggestion of Bowles; does not outweigh the other facts which prove the existence of a partnership; and was not, in fact, intended to change the relationship of the partners which then existed." The plaintiff and all salesmen received their pay from the Company and signed receipts therefor, but "at no time did . . . [the plaintiff] believe that by signing a pay receipt, he was doing so as an employee of the . . . Company." In a deposition taken in 1933, the plaintiff stated that he did not believe he was an employee of the Company, that he was in the employ of the sign company, and that he did not know exactly the status of the sign company. The sign company filed no income tax returns, and its losses were claimed as a deduction and its profits added to income by the Company upon its returns. But this "action of . . . [the] Company was without the knowledge or authority of plaintiff, at least until 1932 or 1933, and such action was not intended to change the partnership relation which then existed." In

1932, when the Company went on a five-day week and its employees received a corresponding cut in pay, the plaintiff, instead of receiving $60 a week, received a sum which corresponded to the reduction of the employees of the Company, and again, when the Company went on a three-day week, the situation was comparable. He made no complaint about this reduction to Bowles, but "such inaction on his part . . . [was] consistent with his attitude that he was only interested in the success of the . . . [sign company] and that during this period of time . . . [its] business . . . had fallen off substantially and, therefore, he thought it only fair that he share in this period of poor business by reducing his drawings." No "business name" certificate, so called, was ever filed with the city clerk in Springfield by the plaintiff, Bowles, or the Company.

"A partnership is an association of two or more persons to carry on as coöwners a business for profit . . . . There must be a voluntary contract of association for the purpose of sharing the profits and losses, as such, which may arise from the use of capital, labor or skill in a common enterprise, and an intention on the part of the principals to form a partnership for that purpose." *Mitchell* v. *Gruener*, 251 Mass. 113, 123. *Seemann* v. *Eneix*, 272 Mass. 189, 194. See *Beatty* v. *Ammidon*, 260 Mass. 566, 576. Subject to any agreement between partners, each shall share equally in the profits, and must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits. *Lavoine* v. *Casey*, 251 Mass. 124, 127. See *Kavanaugh* v. *Johnson*, 290 Mass. 587, 596.

We are of opinion that the subsidiary findings of the master warrant the conclusion that a partnership was formed. The facts as to the plaintiff's dealings and relations with the Company and the fact that he stated that he did not know exactly the status of the sign company, when considered with the representations of Bowles to him, are not conclusive against the finding of the partnership relation, nor is the failure to file a business name certificate. See *Crompton* v. *Williams*, 216 Mass. 184, 187.

2. We are of opinion that the sums received by the plain-

tiff under the "drawing account" must be treated as advances against profits. The right of the plaintiff to compensation for his services depends solely upon agreement, express or implied. *Shulkin* v. *Shulkin,* 301 Mass. 184, 188–189, and cases cited. The master found that the parties agreed "to go 50–50," and, in answer to the question to the plaintiff as to whether it was his understanding of the agreement that he was to be paid and Bowles was not to be paid for services, he replied: "We were to go 50–50." When he answered this question, he knew that he had received over $15,000 by way of a drawing account, and that Bowles had never received anything by way of distribution of earnings. The master stated that if he were permitted to draw the inference, it would be that the sums received by the plaintiff were pursuant to the partnership agreement whereby he was to be compensated "for devoting his time and energy to the partnership business." The trial judge drew a contrary inference, and we think the latter was right. Cases like *Menage* v. *Rosenthal,* 187 Mass. 470, and *Theriault* v. *E. L. King & Co. Inc.* 282 Mass. 109, do not help in solving the problem. The words "drawing account" are not immediately qualified by any other specific words.

The real question is to ascertain, in so far as possible, the intention and understanding of the parties. In the absence of an express agreement, the rule that no compensation is to be allowed precludes it, unless the other agreements as to the business to be done and the mode of conducting it show that compensation was intended. If this intention is doubtful, the subsequent course of dealing and conduct of the parties may be considered in determining whether there is such an implication in favor of the allowance of compensation as is tantamount to an express agreement. *Hoag* v. *Alderman,* 184 Mass. 217, 219. The importance of the agreement "to go 50–50" cannot be overlooked. It is true that there is no reported fact that these words have acquired a fixed meaning in business transactions, but we think that it is good sense to understand the words as meaning the division into halves of something that was under discussion by the parties at the time. In our effort to give

effect to the agreement of the parties, so far as it can be ascertained from the language used, it is not necessarily an insuperable obstacle that some part of the agreement may be expressed in the vernacular of the street. See *Chafin v. Main Island Creek Coal Co.* 85 W. Va. 459, 463; *Dunn v. Gilbert*, 36 Wyo. 249, 256; 11 Am. L. R. 661. We construe this expression, "to go 50–50," to mean that the parties in question agreed that they were to be equally interested in the partnership business.

The plaintiff was a glass blower, and was recommended to Bowles as one who was familiar with, and had the ability to build, neon signs. The purpose of the partnership was to manufacture and sell such signs. Bowles was to furnish the "necessary financial backing," and it is a reasonable inference that the plaintiff, in turn, was to devote himself to the manufacture, at least, of the signs. Under such an arrangement, and the specific agreement "to go 50–50," neither partner would be entitled to compensation for services in the absence of an express or implied agreement. It is to be observed that there is no specific agreement that the plaintiff should receive any salary, as such. It has been said that a drawing account is a well recognized modern business method of furnishing the employee with means of maintenance while engaged in a service from which wages and commissions are to accrue. *Packard Motors Co. of Alabama v. Tally*, 212 Ala. 487, 489. See *Holland v. Lange*, 113 Misc. (N. Y.) 469, 470. The plaintiff came from California, where it would seem that he was employed, and he then was contemplating going into the neon sign business himself in Texas. In fact, he said that he was then busy procuring equipment for that purpose. In the circumstances, it is reasonable to infer that he might require something by way of his maintenance when he came here, although it would also seem that, if he set up business for himself in Texas, he would have to depend upon his own efforts or resources for it there. In any event, he did not stipulate, in terms, for the payment of any salary. He was merely to receive a weekly amount, termed a "drawing account," from a partnership that was upon a "50–50"

basis. Upon all the findings, we are of opinion that his drawing account was against possible profits, and not by way of payment for his services. We also think that the conduct of the parties after the partnership was formed tends to support this conclusion.

3. The master found that Bowles violated the partnership agreement, and "in concert with and through the instrumentality of the . . . Company, has taken possession of all of the partnership assets, including its good will, away from the partnership and the new organization is using said assets." He also found that the Company participated in Bowles's violation of his fiduciary duties "both in the institution of said action at law, and in appropriating to its own use certain partnership assets." The trial judge found that both Bowles and the Company are responsible for the seizure of the partnership assets valued at $10,000 and that the Company was indebted to the partnership in the sum of almost $13,800, and the decree establishes this indebtedness and orders these sums to be paid.

The only contention of the defendants in this respect is that this part of the decree was not within the scope of the bill, and we are of opinion that this is so. See *National Rockland Bank of Boston* v. *Johnston,* 299 Mass. 156, 157. It is apparent, however, that the issue was tried before the master. At the very outset of his report, he states one of the issues as being what indebtedness, if any, did the partnership owe to the Company, and also, as involved in this issue, what offsets, if any, exist in favor of the partnership against the Company. But where, as here, the issue was tried, it ought not to be tried again, and the plaintiff should be allowed to amend his bill for the purpose of presenting formally on the record the issues that were, in fact, tried. *Albano* v. *Puopolo,* 309 Mass. 501, 511.

It seems apparent that the final decree does not take into account an item of $230 collected by the plaintiff on account of the partnership receivables. In addition to this sum, he received $15,671.44. The master, making his computations, found that the plaintiff was accountable for the total of these two sums, but the decree does not charge the plain-

tiff with the receipt of the $230. This matter should be adjusted in the final decree.

The final decree contains no reference to the suit brought by the Company against the partnership, in which the attachment made has never been dissolved. We are of opinion that the Company should be enjoined from proceeding further with that action, but without prejudice, however, to whatever rights the deputy sheriff, who made the attachment, may have against the Company.

It is to be observed that the final decree, among other things, orders Bowles and the Company to pay $10,000, the value of the assets of the partnership. This does not amount to the imposition of a double liability and a payment by one would discharge the other. *Gross-Loge des Deutschen Ordens der Harugari* v. *Cusson*, 301 Mass. 332, 335.

If, within thirty days after rescript, an appropriate amendment to the bill is allowed by the Superior Court, then the final decree modified in accordance with this opinion is affirmed. If no such amendment is allowed, then, and without containing any order for payment by the Company, the final decree, modified in accordance with this opinion, is affirmed.

The plaintiff is to have his costs.

*Ordered accordingly.*